# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

**Case No:  1:10-cv-11753**

**WILLIAM A. INGRAHAM, JR. and
CAROL INGRAHAM**

Plaintiffs

v.

**JOHNSON & JOHNSON,
ORTHO-McNEIL PHARMACEUTICAL, INC.,
and
JOHNSON & JOHNSON PHARMACEUTICAL
RESEARCH AND DEVELOPMENT, LLC**

Defendants

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, William A. Ingraham, Jr. and Carol Ingraham, by and through their attorneys

of record, hereby file this Complaint and Demand for Jury Trial against Defendants, Johnson &

Johnson, Ortho-McNeil Pharmaceutical, Inc., and Johnson & Johnson Pharmaceutical Research

& Development, LLC (collectively the "Defendants"), and states on information and belief as

follows:

## INTRODUCTION

1.      This case involves a fluoroquinolone antibiotic called levofloxacin (brand name

"Levaquin"), which caused the Plaintiff, William A. Ingraham, Jr., to suffer tendon injuries.

2.      Levofloxacin was designed, formulated, promoted, sold and distributed by the

Defendants in the United States as Levaquin® from 1997 through the present.

1

3.      Levaquin was approved by the United States Food and Drug Administration ("FDA") for treatment of a variety of serious infections.  However, the Defendants market Levaquin as a first line therapy for common bronchitis and sinusitis infections, and for which many other, safer, antibiotics are available.

4.      As compared to other fluoroquinolone antibiotic drugs, Levaquin causes a higher incidence of tendon injuries, including tendon rupture, especially in persons over 60 years of age and/or who are on corticosteroid therapy, none of which was adequately disclosed to the Plaintiff and her doctor(s).

5.      Levaquin–induced tendon injury involves the degradation of the tendon tissue, leading to severe and permanent injuries.

6.      Although the high likelihood of tendon injuries was known to the Defendants, the Defendants failed to adequately disclose the information and/or warn their customers, including the Plaintiffs and/or their doctor(s).

7.      As a result, the Plaintiff, William A. Ingraham, Jr., used Levaquin and was caused to suffer severe and debilitating tendon injuries.

8.      This lawsuit asserts claims against the Defendants for negligence, breach of implied warranty of merchantability, breach of implied warranty - defective manufacturing, breach of implied warranty - design defect, breach of implied warranty - failure to warn, breach of express warranty, fraud, unjust enrichment and loss of consortium.

## JURISDICTION

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and all Defendants.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the Defendants researched, designed, licensed, manufactured, tested, marketed, distributed, and/or sold the prescription drug Levaquin within this judicial district and because Defendants are subject to personal jurisdiction within the State of Massachusetts.

## PARTIES

11.     The Plaintiffs, William A. Ingraham, Jr. ("Mr. Ingraham") and Carol Ingraham ("Mrs. Ingraham"), are citizens and residents of Vineyard Haven, Massachusetts.

12.     The Defendant, Johnson & Johnson, is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

13.     The Defendant, Ortho-McNeil Pharmaceutical, Inc. ("Ortho-McNeil"), is a Delaware corporation with its principal place of business in Raritan, New Jersey. Ortho-McNeil is a wholly owned subsidiary of Johnson & Johnson.

14.     The Defendant, Johnson & Johnson Pharmaceutical Research & Development, LLC ("Johnson & Johnson Pharmaceutical"), is a New Jersey corporation with its principal place of business in Raritan, New Jersey. Johnson & Johnson Pharmaceutical Research & Development is a wholly owned subsidiary of Johnson & Johnson and was formerly known as R.W. Johnson Pharmaceutical Research Institute.

15.    At all times relevant herein, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and sold Levaquin in the interstate commerce and throughout the State of Massachusetts. At all times relevant herein, the Defendants were registered to do business in the State of Massachusetts.

## GENERAL FACTUAL ALLEGATIONS

16.    Levaquin, the Defendants' brand name for the antibiotic levofloxacin, is a broad spectrum synthetic antibacterial agent approved for use in the treatment of a variety of upper respiratory infections, urinary tract infections, prostatitis, and other bacterial infections. It was first introduced into the U.S. market in 1997.

17.    Levaquin is in a class of antibiotics known as fluoroquinolones. The original quinolone antibiotics were developed in the early 1960s and soon revealed themselves as highly effective against common gram-negative bacteria, but resistance developed rapidly. Twenty years later, in the early 1980s, fluorinated derivates of the quinolones emerged, revealing a broader, more potent antibiotic, effective against many different types of infections. These so-called second generation fluoroquinolones included norfloxacin (Noroxin), ciprofloxacin (Cipro), ofloxacin (Floxin), and pefloxacin (never marketed in the U.S.).

18.     Although considered highly effective at killing certain bacteria, fluoroquinolones have long been associated with serious side effects. Indeed, many fluoroquinolones have been removed from the market due to intolerable adverse events. For example, Omniflox (temafloxacin) was removed from the market in 1992 because of low blood sugar, kidney failure, and a certain rare form of anemia; Raxar and Zagam were removed because of QT-interval prolongation among other things; Trovan was removed from the market due to severe liver toxicity; and most recently, Tequin was removed from the market in 2006 amid reports of severe blood sugar reactions such as hyperglycemia and hypoglycemia.

19.     In sum, though fluoroquinolones may share certain pharmacological properties, their safety profiles can differ immensely.

## A. OFLOXACIN – THE FIRST GENERATION OF LEVAQUIN

20.     To understand the pharmacological properties of Levaquin, one need look no further than to Levaquin's older brother, ofloxacin (brand name "floxin"), also manufactured and distributed by the Defendants.

21.     In the early 1960s, the first generation of the quinolones, such as nalidixic acid, was developed for use against common gram-negative bacteria.

22.     Twenty years later, in the early 1980s, fluorinated derivatives of the quinolones, commonly known as fluroquilones, were developed.

23.     Both Floxin and Levaquin were created and developed by Daiichi, Japanese Company who holds the patent on both agents. Daiichi assigned the patents to the Defendants and gave the Defendants an exclusive license to manufacture and market both its fluoroquinolone compounds in the United States in return for royalty fees. Daiichi licenses levofloxacin to Aventis for manufacture and market in European counties. To date, Levaquin remains one of Daiichi's best selling pharmaceuticals.

24.     Daiichi ensured that the post market surveillance of levofloxacin would be tracked world-wide by creating an international database to keep track of adverse events. This database ensured that the Defendants could not ignore the post market experience of levofloxacin in other countries.

25.     Ofloxacin was first introduced into the Japanese market in September 1985. The Defendants introduced ofloxacin, under the brand name Floxin, in the United States six years later, in 1991.

26.     Even before ofloxacin was marketed in Japan, Daiichi began researching products that could be the successor of ofloxacin. Daiichi wanted to develop a newer fluoroquinolone in order to be more competitive with Cipro and the other fluoroquinolones by developing a drug with the same or better characteristics of ofloxacin that could be used both orally and by injection.

27.     After many derivatives of ofloxacin were explored and synthesized, Daiichi isolated what is now known as levofloxacin. Levofloxacin is a purified version of one optically active form of ofloxacin, more specifically the L-isomer.

28.     Accordingly, ofloxacin and Levaquin are pharmacologically very similar -- in fact, so similar that the Defendants alleged in their New Drug Application for Levaquin that the safety profile of Levaquin would be expected to mirror that of ofloxacin.

29.     Unfortunately, while Levaquin did closely follow the safety profile of ofloxacin, Levaquin was worse with respect to certain adverse effects, including tendon toxicity.

**B. EPIDEMIOLOGY OF FLUOROQUINOLONE TENDON TOXICITY: OFLOXACIN IS MORE TENOTOXIC THAN THE REST, AND THE ELDERLY AND USERS OF CORTICOSTEROIDS ARE AT A HEIGHTENED RISK**

30.     Although fluoroquinolones are effective against many different types of infections, fluroquilones have long been associated with serious side effects.

31.     Certain types of fluoroquinolones are more strongly associated with increased toxicity to human organs, and as a result, many fluoroquinolones, such as Omni flox (temafloxacin), Raxar, Zagam, Trovan, and Tequin, have been removed from the U.S. market due to intolerable adverse events.

32.     Tendonitis as a side effect of fluoroquinolones was first reported in 1983. The first case of Achilles tendon rupture was reported in 1991 in conjunction with pefloxacin - a fluoroquinolone that has never been approved in the U.S, in part due to its tenotoxicity. Potentially due to pefloxacin's early use in France, by 1994, Dr. Pierfitte et al. identified over 100 French patients with fluoroquinolone tendon disorders (mostly pefloxacin), and was able to observe that tendon injury occurred more frequently in patients over 60 and especially in those who had received steroid therapy.

33.    Although the Achilles tendon was affected the most, and bilaterally in many cases, Dr. Pierfitte reported that other tendons could by implicated as well. Accordingly, the French regulatory body was one of the first to notify physicians and their patients about the risk of fluoroquinolone-induced tendon injury. Additionally, as a likely result of Dr. Pierfitte's published observations, pefloxacin became severely restricted in use by 1995.

34.    Once pefloxacin became restricted, Defendants' first generation ofloxacin emerged as the most tenotoxic fluoroquinolone on the market.

35.    One of the first published reports regarding the tendon toxicity of ofloxacin was published in 1995 in the British Journal of Clinical Pharmacology (Wilton, LV, Pearce, GL Mann, RD, *A comparison ofciprofloxacin, norfloxacin, ofloxacin, azithromycin and cefixime examined by observational cohort studies*. Br J Clin Pharmacol 1996; 41:277-284).

36.    In the Wilton report, an analysis of prescription event monitoring data in the United Kingdom (a country where pefloxacin was not approved for market) revealed that ofloxacin was more tenotoxic than the other fluoroquinolones examined.

37.    The United Kingdom's Regulatory Authority issued a bulletin, published in July 1995, stating that it had received 21 reports of tendon damage associated with fluoroquinolone antibiotics. The Authority reported "elderly patients and those treated concurrently with corticosteroid are at particular risk."

38.    The Defendants submitted their New Drug Application regarding levofloxacin to the FDA in 1995. Though they indicate that tendon disorders are associated with fluoroquinolone use, the Defendants failed to report that ofloxacin was more tendon toxic than other currently marketed fluoroquinolones and failed to report that the tendon toxicity was exacerbated in the elderly, and especially in those taking corticosteroids.

39.     The first epidemiological study to evaluate the relative risk of fluoroquinolone induced tendonitis was published in 1999 by pharmacoepidemiologists and researchers at the Department of Epidemiology and Biostatistics and Internal Medicine at Erasmus Medical Center in Rotterdam. Van der Linden PD, Van de Lie J, Nab HW, Knok A, Stricker BH Ch, *Achilles tendonitis associated with fluoroquinolones*, Br J Clin Pharmacol 1999; 48:433-437.

40.     Data analyzed in this retrospective cohort study from 41 general practices in the Netherlands from 1995 and 1996 revealed that ofloxacin had the strongest association with Achilles tendonitis. The adjusted relative risk of tendonitis to fluoroquinolones was 3.7, while Achilles tendonitis associated with ofloxacin had a relative risk of 10.1. Upon information and belief, Defendants knew of this study and had an obligation to inform the FDA of this study by supplementing their New Drug Application.

41.     A second epidemiological study published in 2002 by Van der Linden et al. analyzed data from the IMS Health database in the United Kingdom which contained general practice medical records on a source population of 1 to 2 million inhabitants. Van der Linden, PD, Sturdenboom MCJM, Herings, RMC, Leufkens HGM, Stricker BH Ch, *Fluoroquinolones and risk of Achilles tendon disorders: case control study*, BMJ 2002; 324:1306-1307.

42.     In this nested case control study, the authors again found that ofloxacin was associated with an eleven fold increase in tendon disorders. More specifically, the authors found that the relative risk of Achilles tendon disorders following current use of fluoroquinolones was 1.9, but in patients over 60 years of age, the relative risk was 3.2. However, in the elderly, the relative risk was 11.5 for current use of ofloxacin, compared to 2.3 and 1.8 for ciprofloxacin and norfloxacin respectively. In patients of 60 years and older, concurrent use of corticosteroids and fluoroquinolones increased the risk to 6.2. Upon information and belief, Defendants knew of this study and had an obligation to inform the FDA of this study by supplementing their New Drug Application.

43.     Soon thereafter, in 2003, Dr. Van der Linden published his final epidemiological study, a larger population-based case control study that analyzed cases of Achilles tendon rupture and fluoroquinolone use from 1988 to 1998. Stunningly, his report concluded that the relative risk of a tendon injury in patients over 60 years old taking ofloxacin was 27.7 compared to ciprofloxacin's 3.4. He also found that use of corticosteroids nearly doubled the risk for tendon injury for patients over 60 years old.

44.     Even Daiichi Sankyo, the inventor of ofloxacin and Levaquin, published a 1997 rat study that admitted that Levaquin and ofloxacin were the most toxic to tendons of all the fluoroquinolones marketed in the United States. The study was designed to not only better understand the pathophysiological mechanism of fluoroquinolone-induced tendon disorders, but also to compare the relative tendon toxicity of ten different fluoroquinolones.

45.     Although the exact mechanism of how fluoroquinolones cause tendon injury is still being investigated, studies have suggested that fluoroquinolones can degrade tendon cells by causing apoptosis, or a programmable cell death, and therefore causing the tendons to lose their integrity, and easily tear and/or rupture.

46.     The outcome of Achilles tendon ruptures in persons over 60 - the population most affected by this adverse reaction - is not favorable. Treatment may include a corticosteroid to decrease inflammation - the very drug that, when combined with a fluoroquinolone, can dramatically increase the risk of a tendon rupture. In the event of a tendon rupture, the leg is often immobilized through a boot or other casting for anywhere between six weeks to six months, and physical therapy is ordered thereafter. Surgery is frequently not recommended in the elderly population due to poor recovery rates. However, even with immobilization for long periods of time and physical therapy, the Achilles tendons in the elderly rarely fully recover.

### C.  THE FIRST U.S. TENDON WARNING

47.     According to the U.S. consumer watchdog organization, Public Citizen, between 1986 and 1996, there were over 130 reports of fluoroquinolone associated tendon injury from around the world and 52 reports of fluoroquinolone associated tendon injury in the United States.

48.     However, manufacturers of fluoroquinolones did not include warnings of fluoroquinolone-induced tendon injury on their label, and Public Citizen petitioned the FDA in 1996 to require the manufacturers of fluoroquinolones to revise their product label to alert physicians of this unusual adverse event.

49.     The FDA responded by requiring the following warning on all fluoroquinolone labels:

> Ruptures of the shoulder, hand, and Achilles tendons that required surgical repair or resulted in prolonged disability have been reported with [the specific drug name]. [The specific drug name] should be discontinued if the patient experiences pain, inflammation, or rupture of a tendon. Patients should rest and refrain from exercise until the diagnosis of tendonitis or tendon rupture has been confidently excluded. Tendon rupture can occur at any time during or after therapy with [the specific drug name].

50.    By 1997, U.S. manufacturers of fluoroquinolones had modified their label. However, the label was buried in a long list of potential adverse reactions; it was not highlighted in any way, such as with bold lettering, or even a heading titled "tendon injury." Moreover, no mention was made of the fact that age and corticosteroid use tripled the risk of tendon injury. No letter to physicians was disseminated, and Defendants did not highlight this unusual effect when promoting Levaquin to doctors.

## D.  LEVAQUIN'S EARLY POST-MARKET EXPERIENCE

51.    Levaquin was first introduced in Japan in 1993 and later introduced in the United States in 1997.

52.    As has previously been alleged and described, before Levaquin's market launch in the United States, the Defendants had knowledge that:

      a.    Levaquin would be as toxic as ofloxacin;

      b.    Ofloxacin was revealing itself as one of the most tenotoxic fluoroquinolones on the market; and

      c.    The elderly, and especially those using corticosteroids, were at least three times as likely to suffer a tendon injury.

53.    Despite this unique knowledge, the Defendants chose to use the same label that the FDA required on all other fluoroquinolones. Accordingly, in 1997, most U.S. physicians did not understand fluoroquinolone tendon toxicity, and were completely ignorant of the elderly's exceptional vulnerability to this antibiotic, especially those dependent on corticosteroids.

54.     A look at the Defendants' sales materials explains why the Defendants behaved this way: the very group that Levaquin was most toxic to was the very market the Defendants were after. The Defendants' target market for Levaquin was the elderly - especially those with upper respiratory infections who were likely to be chronic corticosteroid users.

55.     More disturbing, the Defendants' promotional campaign was themed on Levaquin's excellent safety profile and failed to disclose the risks of tendon injury.

56.     The Defendants capitalized on Levaquin's early introduction into Japan and other countries by using pre-U.S. prescription sales data to assert that Levaquin had been prescribed frequently with few adverse events.

57.     For example, one such advertisement boasted that Levaquin had "An Outstanding Record of Safety" as "[o]ver 63,000,000 patients worldwide" had taken the drug and only diarrhea and nausea had shown up as adverse effects, albeit rarely.

58.     Cleverly, the promotional literature only reported on adverse events in U.S. clinical trials where only a very small sampling of patients took their drug, and where many adverse events do not necessarily reveal themselves. Thus, the Defendants claimed "proven performance" on the 63,000,000 million people that had used Levaquin outside the United States, but chose not to disclose the adverse events that were being reported on this same population.

59.     As Levaquin gained the attraction, its "Achilles heel" of heightened tenotoxicity revealed itself.

60.     Levaquin enjoyed immediate popularity in the Italian market. Introduced to Italy in 1998, Levaquin became Italy's best-selling fluoroquinolone, surpassing Cipro, the major market leader, in just three years. Curiously, ofloxacin, the Defendant's previous fluoroquinolone, had the lowest market share, which was consistent with Daiichi Sankyo's plan to "cannibalize" ofloxacin in favor of Levaquin.

61.     One of the first comparative studies that included post market experience with Levaquin was from Italy. The authors analyzed Italian adverse event data from 1999 to 2001 to help determine the relative toxicity of each marketed fluoroquinolone antibiotic.

62.     The Italian study was published in 2003 and revealed 1) the most frequently reported serious reaction to fluoroquinolones were tendon disorders 2) Levaquin was the fluoroquinolone with the highest tendonitis reporting rate, and 3) Levaquin ranked first for tendonitis reports during the same period in the World Health Organization's adverse event database, with 522 reports of Levaquin -induced tendon disorders and ruptures.

63.     Not surprisingly, in March 2002, the Italian Health Ministry issued a Dear Doctor letter to inform physicians of the risk of Levaquin-induced tendon rupture.

64.     France also reported a particularly large amount of tendon disorders soon after Levaquin was first marketed to that country in September 2000. By June 2001, in just nine months, 333 adverse reactions had been reported, with tendon disorder being the most frequently reported adverse event. Again, the adverse event data supported the epidemiological evidence finding that tendon injuries were more prominent in the elderly, especially when there had been co-administration of corticosteroids.

65.     France's regulatory authority published a Dear Doctor letter to highlight this information in 2002.

66.     Similarly, the Belgian regulatory authority received 161 reports of Levaquin-induced tendon injury, including 68 reports of tendon rupture, in the first two years of Levaquin's introduction into Belgium. Again, the average age of patients with Levaquin-associated tendinopathy was 69 years old and about half were receiving concomitant corticosteroid treaunent. As with other adverse event data, the tendon injuries were reported to occur soon after Levaquin was ingested. Belgium also noted, similar to Italy, that the number of tendon disorders associated with Levaquin was much higher than that of the other quinolones. Not surprisingly, ofloxacin had the second highest reports of tendon injury.

67.     Recognizing that the number of tendon effects from Levaquin were far more frequent that any of the older fluoroquinolones which had all been on the market over the past ten years, the Belgium regulatory authority also disseminated a Dear Doctor letter in 2002 highlighting their concerns about Levaquin's toxicity and suggesting that Levaquin is only justified for the treatment of community-acquired pneumonia in patients who are allergic to beta-lactams. The agency stressed the elderly and people who used corticosteroids were particularly at risk and encouraged doctors that if Levaquin treatment was necessary, to watch for tendon injury.

68.     After nearly five years on the market in the United States, and following the post-marketing data out of Europe, Defendants finally decided to update their tendon warning.

### E.  LEVAQUIN'S SECOND TENDON WARNING

69.     The pre-2002 Levaquin label bore the required tendon warning from its market launch in 1997. It was the last of the warnings listed, with no header or any other identification to alert a practitioner to this unusual side effect. The warning was behind gastrointestinal affects, hypersensitivity reactions, and even the rare event of anaphylactic shock.

70.     In 2002, the Defendants embedded the following in the existing tendon warning: "Post-marketing surveillance reports indicate that this risk may be increased in patients receiving concomitant corticosteroids, especially in the elderly."

71.     Through an international database managed by Daiichi Sankyo, the Defendants had access to the post market surveillance data all over the world, and specifically France, Belgium, Italy, and the United Kingdom.

72.     By 2002, the adverse event data in all those countries consistently and unequivocally revealed that the risk of tendon injury was nearly triple for people over 60 as compared to people under 60. Additionally, the Defendants had knowledge of at least one epidemiological study confirming the age effects of fluoroquinolone use. All data pointed to the fact that Levaquin was more tendon toxic than all other fluoroquinolones.

73.     Despite a wealth of information, the Defendants chose not to warn their target patient population - the elderly - with their 2002 warning. Instead, they muted their additional tendon warning by flipping the confounders. Rather than warn that the risk of tendon injury was increased (tripled) in the elderly, the warning stated that that the risk was possibly increased in those using corticosteroids. According to the Defendants' warning, any elderly person not on corticosteroids therefore had no additional risk of a tendon injury, and the fact that the warning was so equivocal regarding corticosteroids diffused any possible effect of warning physicians of the effect of age on the frequency and severity and of this debilitating injury.

74.     Nor did the Defendants make any effort to highlight this new information to its prescribing doctors – the Defendants did not send any Dear Doctor letters regarding the 2002 label change to any healthcare practitioners, as had been done in Italy, Belgium, and France.

75.     Accordingly, despite the 2002 label change, Levaquin prescriptions only increased, and tendon injuries mounted.

**F.  THE DEFENDANTS THWART EFFORTS TO HIGHLIGHT LEVAQUIN'S INCREASED RISK OF TENDON INJURY**

76.     Alarmed by the early post market experience with Levaquin, France, Belgium, Italy, the United Kingdom, and other European countries convened before the European Agency for the Evaluation of Medicinal Products (EMEA) as early as September 2001 to discuss a heightened warning for Levaquin.

77.     The EMEA proposal was that Levaquin would be singled out as the most tendon toxic of the fluoroquinolones with a warning that stated that Levaquin (marketed under the brand name Tavanic) was associated with a greater frequency of tendinopathy and tendon rupture than other fluoroquinolones.

78.     Aventis Pharmaceutical was the manufacturer and distributor of Levaquin in Europe.

79.     Under increasing pressure to agree to the proposed changes to the warning label, Aventis conducted two epidemiological studies in Europe regarding the relative tendon toxicity of Levaquin. The first study used the United Kingdom's General Practitioners Research Database of medical records from 1997 through 2001, and the second used Germany 's Mediplus database of medical records from 1998 to 2001.

80.     Before releasing the results of the two epidemiology studies to the European regulatory authorities, and ostensibly because of the results of the studies, Aventis contracted with Defendants, specifically Johnson & Johnson Pharmaceutical Research & Development, to fund and co-author a study in the United States on tendon rupture and fluoroquinolones.

81.     Advocating that the U.S. Study would be the largest epidemiological study to date and therefore provide the most definitive evidence of the relative risk of Levaquin and tendon injury, and that the European studies to date were too small from which to base a label change, Aventis convinced the European regulatory authorities to forestall the proposed warning change until the preliminary data from the U.S. study was released.

82.     In or around April 2002, Aventis submitted the results of their two European epidemiological studies to the United Kingdom's regulatory authority, the Medicines and Healthcare Products Regulatory Agency (MHRA).

83.     The epidemiology studies conducted by Aventis in Europe concluded that Levaquin was associated with a higher rate of tendon injury than all the other fluoroquinolones compared. Ofloxacin, the fluoroquinolone indicted in early epidemiological studies as the most tenotoxic, came in second.

84.     An assessor at the MHRA concluded that the two epidemiological studies had findings "supporting a signal generated by spontaneous reporting with respect to an increased risk of tendinopathy with Levaquin compared to other fluoroquinolones."

85.     Moreover, the assessor remarked "the finding that ofloxacin (the racemate) is associated with an intermediate level of risk makes pharmacological sense, suggesting that the L-rather than the D-isomer of ofloxacin is likely to be responsible for tendon toxicity . . .given the consistency and plausibility of the findings, a real difference is the most likely explanation."

86.     By the time Aventis released the results of their epidemiological studies, the preliminary results of the U.S. study was reportedly only six months away. Accordingly, the European regulatory authorities agreed to wait before forcing a label change.

87.     The U.S. epidemiological study was funded and co-authored by the Defendant, Johnson & Johnson Pharmaceutical.

88.     Unlike the healthcare databases in Europe which contain computerized medical records, the Defendant, Johnson & Johnson Pharmaceutical, used data from the Ingenix Research database which consisted of U.S. health insurance claims data from 1997 to 2001. The study analyzed only Achilles tendon ruptures and sought to examine whether fluoroquinolone exposure was a risk factor for this injury. It did not assess the relative risk of Levaquin tendon toxicity, as had been requested by the United Kingdom.

89.     Under the guise of data validation, the Defendant, Johnson & Johnson Pharmaceutical, created an algorithm that conveniently excluded nearly 70 percent of health claims for elderly persons who suffered Achilles tendon rupture.

90.     The algorithm used CPT procedure codes that only related to surgical repair which thereby excluded all those Achilles tendon rupture cases where the patient was casted or booted, as is the case in the elderly population.

91.     By manipulating the data, the Defendant, Johnson & Johnson Pharmaceutical, was able to exclude the very group that was prone to tendon rupture.

92.     Not surprisingly, the results of the U. S. epidemiological study - the study upon which hinged regulatory action in Europe with ramifications to the U.S. market - revealed for the first time that there was no increased risk of Achilles tendon rupture associated with any fluoroquinolone use. Neither the confounders of age nor corticosteroid use altered these findings.

93.     Indeed, when one includes the data that was excluded by the algorithm, the result becomes consistent with the approximately eight other epidemiological studies performed on the topic. See Seeger et al. *Achilles Tendon Rupture and its Associations with Fluoroquinolone Antibiotics and Other Potential Risk Factors in a Managed Care Population*, Pharmacoepidemiology and Drug Safety 2006; 15:784-792 ("There was a stronger association with fluoroquinolone antibiotic exposure among these "ruled-out" cases of ATR than among the decision rule confirmed cases. This association was stronger with exposure close to the date of the rupture and was more pronounced among the elderly.")

94.     As a result of the Defendants' misrepresentations in the U.S. Study, the MHRA and the other European regulatory agencies chose not to revise the Levaquin label as they had previously recommended.

### G.  DEFENDANTS DOWNPLAY THE RISK OF LEVAQUIN TO PHYSCIANS

95.     Consistent with their plan to downplay Levaquin's known risk of tendon injury, the Defendants made no attempts to educate physicians in the United States about this unusual adverse event. Although Dear Doctor letters had been widely disseminated throughout Europe advising of Levaquin's tendon toxicity and the vulnerability of this adverse event to the elderly, the Defendants did not so advise the U.S. physicians.

96.     The Defendants' plan was to hide behind the class warning and blame any tendon injuries reported on the general pharmacological properties of a fluoroquinolone antibiotic rather than on the L-isomer of the ofloxacin compound as the Aventis studies suggested.

97.     Promotional material designed and distributed by the Defendants, and more specifically, by the Defendant, Ortho-McNeil, consistently omits the risk of tendon injury on materials left with physicians.

98.     Accordingly, physicians continued to prescribe Levaquin believing it to have the same safety profile as Cipro, a competing fluoroquinolone antibiotic, and unaware of the heightened effect of Levaquin on the elderly population.

## H. AN EXPLOSION OF TENDON INJURIES RESULTS IN THE THIRD LABEL CHANGE OF LEVAQUIN

99.     A review of the events in the FDA Adverse Event database from 1997 through 2005, for Levaquin alone, showed 1,044 reports of tendon injuries, with 282 reports of tendon rupture. This six year figure for tendon affects associated with Levaquin far surpassed the ten year history of tendon affects from 1985 through 1995 associated with all pre-Levaquin fluoroquinolones.

100.    After Cipro went generic in 2003, Levaquin became the number one prescribed fluoroquinolone in the United States. When Zithromax, a highly popular macrolide antibiotic, went generic after its patent expired in 2005, Levaquin became the number one prescribed antibiotic in the world in 2006.

101.    Corresponding with Levaquin's increased popularity, the number of adverse events reported to the FDA reported soared. 143 tendon related injuries were reported in 2006, and in just the first quarter 2007, 107 tendon related injuries were reported where Levaquin was the primary suspect.

102.    The Levaquin phenomenon did not go unnoticed by the Illinois Attorney General. On May 18, 2005, the Attorney General submitted a petition to the FDA requesting a black box warning on fluoroquinolones. The Attorney General suggested that the black box was necessary to highlight the seriousness of tendon injuries and that the risk is increased in the elderly and in patients on corticosteroids.

103.    The Attorney General also requested that the manufacturer issue a Dear Doctor letter to inform the health care providers about this significant hazard to health, as the tenotoxic effects of fluoroquinolones were not well known to practicing physicians.

104.    In the Petition, the Attorney General's office reviewed the literature and stated that tendon injuries were not a rare complication of fluoroquinolone use. The Petition complained that the current tendon warning was "buried in lists of potential side effects which are both less frequent and less severe."

105.    One year later, Public Citizen, the same consumer watchdog organization that petitioned the FDA in 1996 for a tendon warning, petitioned the FDA again saying the first tendon warning did not go far enough. Citing the alarming increase in reports of tendon injury, Public Citizen joined the Illinois Attorney General's petition and urged that the FDA place a black box warning regarding the risk of tendonitis and tendon rupture.

106.    At the request of the FDA, in April 2007, the Levaquin label changed for a third time with regard to tendon injuries. The new label is not a black box, but it now states that indeed the elderly are at an increased risk of tendon injury, and unequivocally states that the risk is increased with concomitant use of corticosteroids, contrary to the results of Defendant's Ingenix study.

107.    Upon information and belief, the Defendants negotiated with the FDA and insisted on a class warning to thereby minimize the heightened risk of tendon injury with Levaquin.

108.    The class warning failed to alert physicians and prescribing health care providers that Levaquin is more toxic to the tendons than the other fluoroquinolones available in the U. S. market. Health care providers have no warning that Levaquin is much more tenotoxic than other drugs in the class and therefore will interpret the relative risk of a Levaquin-induced tendon injury inappropriately.

109.    The Defendants, upon information and belief, did not advise physicians of the 2007 label change and therefore, physicians still did not receive this new information regarding the vulnerability of the elderly population to a Levaquin-induced injury.

110.    On July 8, 2008 the FDA notified the Defendants "of the need to add a boxed warning to the prescribing information about the increased risk of developing tendonitis and tendon rupture in patients taking fluoroquinolones."

111.    Meanwhile, the Defendants continued to market Levaquin as a first line therapy for common bronchitis and sinusitis infections for which many other, safer, antibiotics are available.

## SPECIFIC FACTUAL ALLEGATIONS

112.    The Plaintiff, William A. Ingraham, was 59 years old male on or about May 8, 2008 when he was prescribed and ingested Levaquin as indicated by his physician for possible bronchitis. After taking Levaquin for four days, Mr. Ingraham began suffering severe pain and disability in his ankles and heels bilaterally. Within days, Mr. Ingraham was diagnosed with bilateral and acute Achilles tendonitis, and Achilles tendon tears, which have required hospital admissions, courses of physical therapy and rehabilitation, and outpatient visiting nurse care. Since that time and continuing to the present, Mr. Ingraham suffers continuing pain, discomfort, weakness, loss of balance, loss of range of motion, spasms and instability in the affected areas of his lower legs. As a direct and proximate result of the Levaquin-induced Achilles tendonitis, Mr. Ingraham's ability to perform normal daily tasks has been significantly compromised and his quality of life severely diminished.

## COUNT I: NEGLIGENCE
### (William A. Ingraham, Jr. v. Johnson & Johnson, et al.)

113.    The Plaintiff, William A. Ingraham, Jr., incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

114.    At all relevant times, the Defendants had a duty to exercise reasonable care in the design, testing, manufacture, marketing, sale, and distribution of Levaquin into the stream of commerce, including a duty to ensure that Levaquin did not pose a significantly increased risk of bodily injury to its users.

115.    The Defendants had a duty to exercise reasonable care in the advertising and sale of Levaquin, including a duty to warn Mr. Ingraham and other consumers of the dangers associated with the consumption of Levaquin that were known or should have been known to Defendants at the time of the sale of Levaquin to Mr. Ingraham.

24

116.     The Defendants failed to act as an ordinary, reasonably prudent manufacturer in like circumstances in the design, testing, manufacture, marketing, labeling, warning, sale and distribution of Levaquin because the Defendants knew or should have known that Levaquin had a propensity to cause serious injury, including tendon ruptures and other serious tendon injuries.

117.     Despite the fact that the Defendants knew or should have known that Levaquin had a propensity to cause serious injury, including tendon ruptures and other serious tendon injuries, the Defendants continued to manufacture, market, and sell Levaquin for use by consumers.

118.     The Defendants failed to act as an ordinary, reasonably prudent manufacturer in like circumstances in the labeling of Levaquin and failed to issue adequate pre-marketing or post-marketing warnings to prescribing doctors and the general public regarding the risk of serious injury, including, without limitation, tendon ruptures.

119.     The Defendants failed to act as an ordinary, reasonably prudent manufacturer in like circumstances in that it failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable at the time the Defendants sold Levaquin to Mr. Ingraham.

120.     The Defendants knew or should have known that Mr. Ingraham could foreseeably suffer injury as a result of the Defendants' failures to exercise ordinary care as described above.

121.     The Defendants breached their duty of reasonable care to Mr. Ingraham by failing to exercise due care under the circumstances.

122.     As a direct and proximate result of the Defendants' acts and omissions, including their failure to act as an ordinary, reasonably prudent manufacturer in like circumstances and failure to exercise due care in the design, formulation, manufacture, sale, and distribution of Levaquin, Mr. Ingraham ingested Levaquin and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### COUNT II: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
**(William A. Ingraham, Jr. v. Johnson & Johnson, et al.)**

123.     The Plaintiff, William A. Ingraham, Jr., incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

124.     The Defendants designed, manufactured, marketed, and sold Levaquin as has previously been alleged and described herein.

125.     At the time the Defendants designed, marketed, sold and distributed Levaquin, the Defendants knew of the use for which Levaquin was intended and impliedly warranted that Levaquin was not defective and unreasonably dangerous, and that Levaquin was merchantable, safe and fit for its intended purpose: namely that Mr. Ingraham could ingest Levaquin without the risk of serious injury, including but not limited to, tendon rupture.

126.     Mr. Ingraham, a foreseeable user of Levaquin, and Mr. Ingraham's physicians, reasonably relied upon the Defendants' skill and judgment as to whether Levaquin was merchantable, safe and fit for its intended purpose, and upon the Defendants' implied warranties as to such matters.

26

127.     Contrary to such implied warranty of merchantability, Levaquin was not of merchantable quality nor was it safe for its intended use, because the product was unreasonably dangerous as described above.

128.     As a direct and proximate result of the Defendants' breach of their implied warranty of merchantability, Mr. Ingraham ingested Levaquin and has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to damages in an amount to be proven at trial.

## COUNT III: BREACH OF IMPLIED WARRANTY—DEFECTIVE MANUFACTURING
### (William A. Ingraham, Jr. v. Johnson & Johnson, et al.)

129.     The Plaintiff, William A. Ingraham, Jr.,  incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

130.     The Defendants designed, manufactured, marketed, and sold Levaquin as has previously been alleged and described herein.

131.     Levaquin, as designed, manufactured, marketed, sold and/or placed in the stream of commerce by the Defendants, was defective in its manufacture and construction when it left the hands of the the Defendants, in that it posed an increased risk of tendon injury in patients over the age of 60 (especially to those who were concomitantly ingesting corticosteroids with Levaquin or just after using Levaquin), and was unreasonably dangerous when used for its intended purpose by an ordinary user or consumer.

132.    As a direct and proximate result of Mr. Ingraham's use of Levaquin as defectively manufactured, designed, marketed, sold, and introduced into the stream of commerce by the Defendants, Mr. Ingraham has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to damages in an amount to be proven at trial.

## COUNT IV: BREACH OF IMPLIED WARRANTY—DESIGN DEFECT
### (William A. Ingraham, Jr. v. Johnson & Johnson, et al.)

133.    The Plaintiff, William A. Ingraham, Jr.,  incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

134.    At all times relevant herein, the Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, licensing, distributing, and selling the prescription drug Levaquin, either directly or indirectly through third parties, as has previously been alleged and described.

135.    Levaquin as manufactured and/or sold by the Defendants reached Mr. Ingraham without substantial change in its condition and was used by Mr. Ingraham in a reasonably foreseeable and intended manner.

136.    Levaquin was "defective" and "unreasonably dangerous" when it left the Defendants control, entered the stream of commerce, and was received by Mr. Ingraham because it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer. At no time did Mr. Ingraham have a reason to believe that Levaquin was in a condition not suitable for its proper and intended use.

137.    Levaquin is defective in design because of its propensity to cause tendon ruptures and other serious tendon injuries.

28

138.   The Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable at the time the Defendants sold Levaquin to Mr. Ingraham.

139.   As a direct and proximate result of the Defendants' breach of their implied warranties due to Levaquin's defective design, Mr. Ingraham ingested Levaquin and has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to damages in an amount to be proven at trial.

### COUNT V: BREACH OF IMPLIED WARRANTY—
### FAILURE TO PROVIDE ADEQUATE WARNINGS
**(William A. Ingraham, Jr. v. Johnson & Johnson, et al.)**

140.   The Plaintiff, William A. Ingraham, Jr., incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

141.   The Defendants had a duty to warn Mr. Ingraham and his treating physicians about the defective and dangerous nature of Levaquin in its normal and intended use.

142.   The Defendants had a duty to warn Mr. Ingraham and his treating physicians about the material risks of using Levaquin in a manner comprehensible to the average user, calculated to convey the materials risks to the mind of a reasonably prudent person, and at intensity commensurate with the danger involved.

143.    Despite the fact that the Defendants had knowledge and information confirming the defective and unreasonably dangerous nature of Levaquin, the Defendants failed to adequately and sufficiently warn Mr. Ingraham and his physicians that Levaquin can cause serious tendon injuries including, without limitation, tendon ruptures.

144.    Levaquin is defective because it was sold to Mr. Ingraham without adequate warnings regarding, inter alia, the propensity of Levaquin to cause serious tendon injuries; the post-marketing experience with Levaquin; the increased risk of tendon injury in patients over the age of 60; the numbers of tendon-related adverse events reported; and the probability of suffering an acute tendon injury when ingesting corticosteroids concomitantly with Levaquin or following Levaquin use.

145.    As a direct and proximate result of the Defendants' breach of their implied warranty due to Levaquin's inadequate warnings, Mr. Ingraham ingested Levaquin and has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to damages in an amount to be proven at trial.

## COUNT VI: BREACH OF EXPRESS WARRANTY
### (William A. Ingraham, Jr. v. Johnson & Johnson, et al.)

146.    The Plaintiff, William A. Ingraham, Jr., incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

147.    The Defendants through their marketing program, promotional activities, product labeling, package inserts, and other written and verbal assurances expressly warranted to physicians and consumers, including Mr. Ingraham and/or his physicians, that Levaquin had been shown by scientific study to be safe for its intended use.

148.     Mr. Ingraham and/or his physicians reasonably relied upon the Defendants' express warranties in purchasing, consuming, and prescribing Levaquin.

149.     The Defendants breached their express warranties because Levaquin as manufactured and sold by the Defendants does not conform to these express representations in that Levaquin has a propensity to cause tendon ruptures, other serious tendon injuries, and serious bodily harm.

150.     As a direct and proximate result of the Defendants' breach of its express warranties, Mr. Ingraham ingested Levaquin and has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VII: FRAUD
### (William A. Ingraham, Jr. v. Johnson & Johnson, et al.)

151.     The Plaintiff, William A. Ingraham, Jr., incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

152.     The Defendants were under a duty and failed to discharge their duty to exercise reasonable care to disclose to Mr. Ingraham and his doctors the defective nature and risks that Levaquin can cause severe and permanent injuries, including, without limitation, tendon ruptures, of which they had special knowledge not available to Mr. Ingraham or his doctors, and as to which they made affirmative representations in violation of all applicable laws, and actively concealed material facts relating to the defective nature and risks of Levaquin, which were peculiarly within its knowledge, knowing that Mr. Ingraham and his doctors would rely on the presumption that no such facts exist.

31

153.     The Defendants knew that Levaquin can cause severe and permanent injuries, including without limitation, tendon ruptures; indeed, the Defendants knew that tendon injuries associated with Levaquin had occurred for years. The Defendants had actual knowledge at the time of sale of Levaquin to Mr. Ingraham that Levaquin created a risk of serious bodily injury to its users, including, without limitation, tendon injuries, based, in part, upon test results, studies, adverse reaction reports, regulatory action in foreign countries, published reports, and their own clinical trials and post-marketing surveillance of Levaquin and its molecularly similar counterpart, ofloxacin.

154.     At all times during the course of dealing between the Defendants and Plaintiff, the Defendants knowingly and recklessly omitted and concealed information peculiarly within their knowledge to Mr. Ingraham, his doctors, the scientific community and to the general public regarding the dangers of Levaquin, including the special risk of tendon injury and tendon ruptures, particularly to the elderly - knowing that the scientific community, the general public, Mr. Ingraham and his doctors, would rely on the presumption that the dangers did not exist.

155.     The Defendants actively concealed from Mr. Ingraham, his doctors, the scientific community and the general public:

    a.     that their own test results, published studies, and/or clinical trials showed a statistically high risk of serious tendon injuries associated with Levaquin including, without limitation, tendon ruptures; and/or

    b.     that Levaquin was not adequately tested for serious tendon injuries before or after its introduction on the market; and/or

      c.       that Levaquin was, in fact, unsafe as it posed a risk of injury,

                which outweighed any purported benefits.

156.     The Defendants misrepresented that Levaquin was safe and effective for its intended uses by affirmative misrepresentation, by active concealment, by omission of material facts regarding the safety and effectiveness of Levaquin, and/or by their course of conscious or intentional conduct succeeded in selling and marketing dangerous, defective, and ineffective antibiotics to be ingested by Mr. Ingraham. The Defendants intentionally omitted, concealed and/or suppressed this information from consumers, including Mr. Ingraham and his doctors, in order to avoid losses in sales to consumers and market share to its major competitors.

157.     Moreover, the Defendants engaged in an aggressive marketing strategy, which included false representations regarding the safety profile and known adverse side effects of Levaquin to create the impression and to convey to Plaintiff and the general public:

      a.       that Levaquin had a favorable safety profile and was fit for human consumption;

      b.       that the benefits of taking Levaquin outweighed any associated risks; and

      c.       that the use of Levaquin was safe and had fewer adverse health and side effects than were known or should have been known by Defendants at the time of these representations.

158.    The omissions, misrepresentations and concealment described in the preceding paragraphs occurred, without limitation, in the Levaquin warning labels, advertisements and promotional materials, in the Defendants' funded or created scientific reports, and the failure to provide other special notification of the dangers of Levaquin to Mr. Ingraham or his doctors, for example, in "Dear Doctor" letters. The Defendants' statements omitted, concealed, and misrepresented the dangers of serious injury, including, but not limited to, tendon ruptures, particularly to the elderly, to Mr. Ingraham and his prescribing doctor.

159.    The Defendants engaged in fraud by deliberately and affirmatively concealing and failing to disclose adverse reactions of Levaquin to Mr. Ingraham, his doctors, the scientific community, and the general public, by disseminating only positive and misleading scientific data, and by concealing scientific data that showed increased risk of tendon-related injury, to Plaintiff, his doctors, the scientific community, and the general public.

160.    Mr. Ingraham and his doctors relied on the warning labels as they appeared in the patient package insert at the time they were prescribed Levaquin. The applicable warnings concealed and omitted material facts relating to the defective nature and risks of Levaquin. These dangers were peculiarly within the Defendants' knowledge, and were omitted and concealed knowing that Plaintiff and his doctors would rely on the presumption that no such facts exist.

161.    The Defendants knew or should have known that their representations and omissions regarding the safety of Levaquin were, in fact, false and/or misleading, and actively made such representations and omissions with the intent, design, and purpose that Plaintiff and others, including prescribing physicians, rely on these representations leading to the prescription, purchase and consumption of Levaquin.

162.     At all times herein, Mr. Ingraham and his doctors were unaware of the dangers of Levaquin with respect to tendon ruptures, including the special risk of tendon injury to the elderly, and were reasonably misled by the Defendants' omission of information about this danger.

163.     At all times herein, Mr. Ingraham and his doctors were unaware of the falsity underlying the Defendants' statements and reasonably believed the Defendants' false statements about the safety and efficacy of Levaquin to be true.

164.     Mr. Ingraham and his doctors could not have discovered the Defendants' fraudulent and misleading conduct at an earlier date through the exercise of reasonable diligence because the Defendants actively concealed their deceptive, misleading and unlawful activities.

165.     Mr. Ingraham and his doctors did, and could be expected to, reasonably and justifiably rely on the Defendants' representations and omissions because the Defendants held themselves out as having expertise and specialized knowledge in the pharmaceutical industry.

166.     Mr. Ingraham justifiably relied upon to his detriment and/or was induced by the Defendants' false statements and active concealment over the safety of Levaquin, in part, because at no time did Mr. Ingraham or his doctors have the knowledge or expertise necessary to independently evaluate the safety of Levaquin.

167.     The Defendants' misrepresentations, concealment, suppression and omissions were made willfully, wantonly, uniformly, deliberately, or recklessly, in order to induce Mr. Ingraham to purchase Levaquin and Mr. Ingraham and his doctors did reasonably and justifiably rely upon the material misrepresentations and omissions made by the Defendants about Levaquin when agreeing to purchase and/or ingest Levaquin.

35

168.     As a direct and proximate result of the Defendants' false representations and/or active concealment of material facts regarding the safety and efficacy of Levaquin, Mr. Ingraham ingested Levaquin and has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of :medical care, rehabilitation, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VIII: UNJUST ENRICHMENT
### (William A. Ingraham, Jr. v. Johnson & Johnson, et al.)

169.     The Plaintiff, William A. Ingraham, Jr., incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

170.     As the intended and expected result of their conscious wrongdoing, the Defendants have profited and benefited from the purchase and implementation of Levaquin by Mr. Ingraham.

171.     The Defendants appreciated and knew of the benefits conferred by Mr. Ingrahams purchase of Levaquin.

172.     The Defendants have voluntarily accepted and retained those profits and benefits, derived from Mr. Ingraham, with full knowledge and awareness that, as a result of the Defendants' fraud and other conscious and intentional wrongdoing, Mr. Ingraham was not receiving a product of the quality, nature, or fitness that had been represented by the Defendants, or that Mr. Ingraham, as reasonable consumers, expected to receive.

173.     The acceptance or retention by the Defendants of the benefits under such circumstances make it inequitable for the Defendants to retain the benefit without payment of its value.

36

174.     By virtue of the conscious wrongdoing alleged above, the Defendants have been unjustly enriched at the expense of Mr. Ingraham, who is entitled in equity, and hereby seeks, the disgorgement and restitution of the Defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

### COUNT IX: LOSS OF CONSORTIUM
**(Carol Ingraham v. Johnson & Johnson, et al.)**

175.     The Plaintiff, Carol Ingraham, incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

176.     As a direct and proximate cause of the Defendants' negligence and breach of warranties, Mrs. Ingraham has been deprived of the spousal affection, care, comfort, society, counsel, services and earning capacity of her husband, Mr. Ingraham, for which she is entitled to compensatory damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs pray for relief against Defendants, jointly and severally, as follows:

1.     Compensatory damages according to proof, in excess of the amount required for federal diversity jurisdiction, and in an amount to fully compensate Plaintiffs for all of their injuries and damages, both past and present;

2.     Special damages according to proof, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiffs for all of their injuries and damages, both past and present, including but not limited to, past and future medical expenses,

costs for past and future rehabilitation and/or home health care, permanent disability, including permanent instability and loss of balance, and pain and suffering.

3.      Double or triple damages as allowed by law;

4.      Disgorgement of profits;

5.      A full refund for all prescriptions paid;

6.      Attorneys' fees, expenses, and costs of this action;

7.      Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

8.      Such further relief as this Court deems necessary, just, and proper.

## **JURY DEMAND**

Plaintiffs demands a trial by jury of all claims asserted in this Complaint.

Respectfully submitted,
The Plaintiffs,
By their attorneys,
PAOLINI & HALEY, P.C.,

/s/ Domenic Paolini
_____
Domenic Paolini, Esquire (dp@dplaws.com)
BBO # 643215
Marketplace Center 3 North
28 State Street 37th Floor
Boston, MA 02109
(617) 951-0300

Date: October 13, 2010